| | | |
|---|---|---|
| **MCK MILLENIUM CENTRE** | ) | |
| **PARKING, LLC,** | ) | |
| | ) | **No. 10 C 8295** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Geraldine Soat Brown** |
| | ) | |
| **CENTRAL PARKING SYSTEM, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case is currently before the court on plaintiff MCK Millenium Centre Parking, LLC's ("MCK") motion for partial summary judgment. [Dkt 54.] MCK moves for summary judgment on Count V of its Supplemental Complaint, in which it seeks damages for breach of a parking garage lease agreement between MCK and defendant Central Parking System, Inc. ("CPS"). For the reasons set forth below, MCK's motion is granted in part and denied in part.

### Background

MCK claims that CPS failed to perform under a November 9, 2006 Lease Agreement between the parties. (Suppl. Compl.) [Dkt 35.] MCK alleges the following counts: specific performance, declaratory judgment, constructive trust, request for an accounting, and breach of

contract. (*Id.*)[1]  In the present motion, MCK seeks summary judgment on the breach of contract count only (Count V).

CPS filed an answer raising several affirmative defenses, including setoff and recoupment. [Dkt 9, 92.]  CPS also brought a counterclaim against MCK and a third party complaint against The Residences at Millennium Centre Condominium Association ("Condo Association"), asking for a declaratory judgment of the parties' rights and obligations under the Lease Agreement. [Dkt 9.] The Condo Association has since been dismissed from this action following a partial settlement agreement between it, CPS, and MCK, which is discussed further below.  [Dkt 89.]


**Parties and the leased property**

MCK is an Illinois limited liability company with its principal place of business in Cook County, Illinois; its members consist of an individual who is domiciled in Illinois and two other Illinois limited liability companies whose members are domiciled in Illinois.  (Def.'s 56.1 Resp. ¶ 1 [dkt 102]; Suppl. Jurisdictional Decl. of Joseph Khoshabe [dkt 90].)  CPS is a Tennessee corporation with its principal place of business in Davidson County, Tennessee.  (Def.'s 56.1 Resp. ¶ 2.)[2]

The Millennium Centre Tower is a high-rise multi-use building located in Chicago that includes residential condominiums, retail businesses, and a parking garage.  (*Id.* ¶¶ 5, 7.)  The building is divided into four separate parcels that include a "Garage Parcel," a "Condominium

---

[1] MCK also brought a count of fraud, but has since voluntarily dismissed it. [*See* dkt 89.]

[2] The court has jurisdiction pursuant to 28 U.S.C. § 1332.  The parties consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(a).  [Dkt 46.]

Parcel," a retail parcel, and a chiller parcel. (*Id.*) MCK owns the "Garage Parcel" of the building. (*Id.* ¶ 6.) The Condo Association owns the "Condominium Parcel," which includes the condo units as well as the Condominium Parking Property ("Parking Property"). (*Id.*) Where the Condominium Parking Property is located relative to the Garage Parcel is not clear from the parties' presentation, but the parties collectively refer to the Parking Property and the Garage Parcel as the "garage." (*See id.* ¶ 6.)[3]

**MCK's Operation Agreement with the other building Owners**

On July 11, 2003, MCK, the Condo Association, and the owners of the retail parcel and the chiller parcel entered into an Operation and Reciprocal Easement Agreement ("Operation Agreement") to govern how they would handle shared spaces and payment of common expenses. (*Id.* ¶¶ 7-12; Pl.'s Mot., Aff. of Joseph Khoshabe, Ex. 3 ("Op. Agrmt.").) [Dkt 60-70.] Confusingly, MCK calls this the "Operating Agreement" while CPS calls it the "REA." This opinion will call it the "Operation Agreement." The portions of the Operation Agreement relevant to this case are as follows.

The owners agreed that a Facilities Manager would be hired to provide maintenance for the "Shared Facilities" (areas used by more than one owner) of the building. (Op. Agrmt. §§ 1.50, 1.91, 6.1.) The owners agreed to pay the Facilities Manager a Facilities Management Fee as consideration for its services, and to pay for Facilities Management Expenses incurred by the Facilities Manager. (*Id.* §§ 6.3, 6.4.) To effectuate payment of the Facilities Management Expenses, the Facilities

---

[3] For clarity, the terms defined in the various agreements are capitalized, while terms used by the court and parties for convenience will not be capitalized.

Manager was to bill each owner an allotted share of a Monthly Facilities Assessment, and any Supplemental Assessment required by an owner's greater than anticipated use of the Shared Facilities. (*Id*. § 6.3.) The Facilities Manager could also bill for an Annual Reserve Assessment. (*Id.*)

The Operation Agreement further provided that MCK would be responsible for maintenance and repair on most of the shared Garage Property and Condominium Parking Property. (*Id.* § 10.1(b).) The costs and expenses so incurred by MCK (hereinafter referred to as "operating expenses") were to be shared by MCK and the Condo Association according to an allocation set out in Schedule 10.1(b)(2) entitled "Garage Cost Allocation," attached to the Operation Agreement, or, if not provided for therein, were to be reasonably apportioned based upon the benefit derived. (*Id.*) MCK was to create a yearly Garage Budget, which could include retaining a Garage Operator to perform MCK's services. (*Id.*) MCK (or the Garage Operator, if retained) was to bill the Condo Association monthly for the Condo Association's share of the operating expenses, and the Condo Association was to pay MCK (or the Garage Operator) within ten days of billing. (*Id.* § 10.1(b).) MCK or the Garage Operator was to prepare an annual operating statement and reconcile and adjust all assessments paid by each Owner. (*Id.*)


**Lease Agreement between MCK and CPS**

On November 9, 2006, MCK entered into a five-year Lease Agreement with CPS whereby MCK leased the Garage Property to CPS for the purpose of operating a parking garage. (Def.'s 56.1 Resp. ¶¶ 13-17; Khoshabe Aff., Ex. 2 ("Lease Agrmt.").) [Dkt 58.] By its terms, the Lease Agreement expired on November 30, 2011. (*Id.*)

CPS denies that it became the "Garage Operator" as defined in Article X of the Operation

Agreement. (Def.'s 56.1 Resp. ¶¶ 12, 13, 32.) The Lease Agreement does not expressly incorporate

that term from the Operation Agreement, nor does it expressly provide that CPS would perform all

of MCK's obligations under Article X of the Operation Agreement.

The central dispute in this case involves paragraph 4 of the Lease Agreement, which provides

that CPS was to pay MCK a monthly Base Rent that increased each year, as well as a portion of the

parking revenue CPS made operating the garage. Paragraph 4 also contains the following provision,

hereinafter referred to as the "disputed clause":

> [1] Lessor has represented to Lessee that it has entered into a Reciprocal Easement
> Agreement, which shall be attached to this Lease as Exhibit B for reference purposes.
>
> [2] Lessee agrees to pay Lessor's proportionate share of **Facilities Management
> Expenses and Assessments** as described in Articles 6.2, 6.3, 6.4 and 6.12 of Exhibit
> B.
>
> [3] As Lessee will be providing management services for the Premises under this
> Lease for the benefit of the Condominium Garage, Lessee shall enter into a separate
> agreement with the **Condominium Owner(s)** and shall bill its proportionate share
> of its **operating expenses** as outlined in Schedule 10.1(b)(2).
>
> [4] Lessor and Lessee agree that Lessee's payment and collection of **operating
> expenses** and payment of **Shared Expenses** pursuant to Exhibit B of this Lease are
> made in order to assist Lessor with the administrative aspect of its obligations as the
> Garage Owner in this agreement.
>
> [5] It is Lessee's intent to recover its **Shared Expenses and Assessments** through
> collections made by allocating the designated amount of operating expenses to the
> **Condominium Garage Owner**, which has been represented by Lessor as achievable.
>
> [6] If Lessee cannot recover the **Shared Expenses and Assessments** through billing
> the **Condominium Garage Owner**, Lessee may recover the difference from Lessor
> by offsetting Base Rent as long as such shortfall is not a result of Lessee's negligent
> management of the Condominium Garage.

(Lease Agrmt. (emphasis added and sentences numbers inserted in brackets to aid discussion

below).)

The parties agree that "Exhibit B" to the Lease Agreement is the Operation Agreement. (Def.'s 56.1 Resp. ¶ 14.)

**Disputes and the partial settlement**

Disputes subsequently arose among CPS, MCK, and the Condo Association about their respective obligations under the various agreements, leading to this lawsuit.

CPS does not dispute the following facts:

(a.)   In April 2011, CPS began to assert a right of setoff against payment of base rent. Pursuant to the partial settlement agreement between the parties executed on August 15, 2011 (discussed further below), all claims related to rent payments before September 2011 were resolved except for a disputed amount of $267,918 (described below). CPS has not paid base rent owed under the Lease Agreement for September, October, and November 2011, totaling $245,943. (*Id.* ¶¶ 32, 36; Def.'s 56.1 Stmt. Add'l Facts ¶ 35 [dkt 102]).)

(b.)   In the Lease Agreement, CPS agreed to pay MCK's proportionate share of the Facilities Management Expenses and Assessments described in the Operation Agreement Sections 6.2, 6.3, 6.4. and 6.12.  (Def.'s 56.1 Resp. ¶ 16.) CPS admits that it did not pay MCK's portion of the Facilities Management Expenses and Assessments for the period of June 1, 2011 through the end of the lease,  November 30, 2011.  (*Id.* ¶ 35).

(c.)  CPS never entered into an separate agreement with the Condo Association as required by sentence 3 of the disputed clause.  (*Id.* ¶ 17.)

(d.)   In the Lease Agreement, CPS agreed to bill the Condo Association for its share of

operating expenses as outlined in Section 10.1(b)(2) of the Operation Agreement. CPS did not bill the Condo Association for operating expenses during the calendar years 2009 and 2010, or in 2011. (Def.'s 56.1 Resp. ¶¶ 19-21.)

(e.) CPS did not bill the Condo Association for MCK's proportionate share of the Facilities Management Expenses and Assessments or seek to collect that amount from the Condo Association at any time during the term of the Lease Agreement. (Def.'s 56.1 Resp. ¶¶ 16, 23 - 31.) (As further discussed below, CPS disputes that it was required to do so.)

(f.) CPS admits that MCK has fully performed under the Lease Agreement. (*Id.* ¶ 37.)

On August 15, 2011, MCK, CPS, and the Condo Association entered into a Partial Settlement and Release Agreement in which the following, among other things, were agreed: (1) CPS would pay $328,452 to the Facilities Manager to satisfy the "Monthly Facilities Assessment, Supplemental Assessment, Annual Reserve Assessment (as those terms are defined in the Operating Agreement) or any other amount due from MCK pursuant to Article VI of the Operating Agreement through May 31, 2011 . . ."; (2) the Condo Association would pay $19,418 to CPS; (3) CPS would pay $141,987 to MCK, representing the difference between the unpaid Base Rent as of the date of the agreement and the $267,918 claimed setoff by CPS; (4) MCK released CPS from all claims for Base Rent under the Lease Agreement except for the period of September-November 2011 as well as the amount of $267,918 of Base Rent for the period prior to the execution of the settlement agreement. (Lassiter Decl., Ex. A at 1-4 ("Settle. Agrmt.") [dkt 97]; Def.'s Resp. at 8-9 [dkt 93].)

In defense of MCK's unreleased claims, CPS asserts the following:

Regarding unpaid base rent prior to May 31, 2011: CPS claims that sentence 6 of the disputed clause entitled it to offset $267,918 from the rent due to MCK prior to May 31, 2011.

(Def.'s 56.1 Resp. ¶¶ 32, 33; Def.'s 56.1 Stmt. Add'l Facts ¶¶ 33, 34.) In its brief, CPS coins a new term, "fees and assessments," which it defines as MCK's payment of obligations under the Operation Agreement Sections 6.1 - 6.4. (Def.'s Mem. at 3.) CPS asserts that the amounts it paid as "fees and assessments" on behalf of MCK under Sections 6.1 through 6.4 of the Operation Agreement exceeded the operating expenses owed by the Condo Association by that amount during that time period. (Def.'s 56.1 Stmt. Add'l Facts ¶ 33.)[4] MCK disputes that the Lease Agreement entitled CPS to any such offset. (Pl.'s Mem. at 6 [dkt 56]; Pl.'s Reply at 9-14 [dkt 78].)[5] Notably, CPS's coined term "fees and assessments" is not congruent with CPS's obligation under sentence 1 of the disputed clause. CPS's definition of "fees and assessments" refers to Sections 6.1 - 6.4 of the Operation Agreement; sentence 1 obligates CPS to pay MCK's share of Facilities Management Expenses and Assessments under Sections 6.2, 6.3, 6.4 and 6.12 of the Operation Agreement. CPS does not explain that discrepancy.

---

[4]  CPS supports the $267,918 figure with a declaration from Daniel Lassiter, a general manager for CPS, who states that this was the difference between the amount of MCK's expenses under Sections 6.1-6.4 of the Operation Agreement that CPS paid and the amount the Condo Association owed in operating expenses pursuant to Schedule 10.1(b). (Def.'s Resp. Ex. C, Decl. of Daniel Lassiter ¶ 5.) CPS has not provided any other documentation to support this figure.

[5]  Confusingly, MCK asserts in its statement of facts that the $267,918 figure represents "MCK's proportionate share of the Facilities Management Expenses and Assessments that, despite demand, CPS has wrongfully failed and refused to pay and improperly off-set against Base Rent due and owing for that same period of time." (Pl.'s 56.1 Stmt. ¶ 33 (citing Khoshabe Aff. ¶ 35).) That statement suggests that this figure represents the amount CPS failed to pay in Facilities Management Expenses and Assessments AND the amount it withheld from the rent. However, pursuant to the partial settlement agreement executed between the parties, it was agreed that the only remaining dispute for the period prior to May 31, 2011 is "MCK's claims against CPS relating to unpaid Base Rent through the Effective Date in the amount of $267,918 for which CPS claims a right of setoff." (Settle. Agrmt. ¶ 1(b)(v).)

Regarding MCK's portion of the Facilities Management Expenses and Assessments from June 1 through November 30, 2011: MCK claims that CPS owes $82,160.52 ($13,693.42 per month for six months).[6] CPS argues that summary judgment should be denied because CPS has a right to offset against its obligation the amount of operating expenses owed by the Condo Association. (Def.'s Mem. at 14.) [Dkt 93.] CPS admits it has not billed the Condo Association for the months of June 1, 2011 through November 30, 2011, but claims that the amount of operating expenses owed by the Condo Association has not yet been determined. (Def.'s 56.1 Stmt. Add'l Facts ¶¶ 30, 31; Lassiter Decl. ¶ 6.) CPS also argues that summary judgment should be denied because it has a right to offset its attorneys' fees if it is the prevailing party, pursuant to the fee-shifting clause of the Lease Agreement. (Def.'s Mem. at 14.) CPS claims those fees currently amount to $39,000. (Def.'s 56.1 Stmt. Add'l Facts ¶¶ 35, 37; Lassiter Decl. ¶ 7.)

In sum, the following remains at issue: (1) the amount of $267,918 that MCK claims CPS owes in rent for the period prior to May 31, 2011, but which CPS claims was a proper setoff; (2) MCK's Facilities Management Expenses and Assessments due under Article VI of the Operation Agreement for the period of June 1, 2011 through November 30, 2011; and (3) the unpaid rent from September-November 2011, which pursuant to the Lease Agreement was $81,981 per month for a total of $245,943 (*see* Def.'s 56.1 Resp. ¶¶ 33-36; Khoshabe Aff. ¶ 35); and (4) whether CPS is entitled to any setoff against the latter two amounts for the Condo Association's unpaid operating expenses or CPS's attorneys' fees.

---

[6] MCK has submitted support for this figure in the form of the affidavit of Joseph Khoshabe, a managing member of MCK. (Khoshabe Aff. ¶¶ 33-35.) MCK also submitted a bill with its reply brief from "Millennium Centre Facilities, Sudler Property Management" (presumably the Facilities Manager) with charges listed as "FAC EXP-GARAGE" in the amount of $13,693.42 for each of the months of February, March, and April 2011. (Pl.'s Reply, Ex. B.)

CPS also asserts it is a named party to a foreclosure action against MCK for MCK's mortgage on the garage, and that due to the foreclosure action, CPS does not know whether a lien has been asserted on any amounts CPS may owe MCK and whom it should pay when those amounts are determined. (Def.'s 56.1 Stmt. Add'l Facts ¶¶ 38-40.)

**Legal Standard**

The court may properly grant summary judgment on any claim or defense – or part of any claim or defense – if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Id.* at 255. The court may not make credibility determinations, "choose between competing inferences," or weigh the evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the non-moving party must designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The Lease Agreement contains a choice of law provision that it be interpreted under Illinois law, and the parties do not dispute that Illinois law applies. (Lease Agrmt. ¶ 20(a).) To establish a breach of contract under Illinois law, MCK must prove that a contract exists, that MCK performed

10

its obligations under the contract, that CPS failed to perform its obligations under the contract, and that an injury to MCK resulted. *See Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001) (citing *Hickox v. Bell*, 552 N.E.2d 1133, 1143 (Ill. App. 5th Dist. 1990). The parties do not dispute that the Lease Agreement was a valid contract, but do dispute the interpretation of its terms and whether CPS failed to perform its obligations under the agreement. The parties also dispute the calculation of damages.

Thus, the court must determine whether, as a matter of law, CPS violated the terms of the contract and whether MCK incurred damages as a result. The first step is to examine the terms of the contract itself. In interpreting any contract, the court's objective is to give effect to the parties' intent. *Home Ins. Co. v. Chicago & N.W. Transp. Co.*, 56 F.3d 763, 767 (7th Cir. 1995) (applying Illinois law). In a written contract, the parties' intent is determined first by looking to the plain and ordinary meaning of the contract language on its face. The court considers the contract as a whole, and gives effect to all of its parts. *Id.* If a contract is unambiguous, a court will enforce it as written, without looking to extrinsic evidence. *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (applying Illinois law).

However, if the court determines the contract is ambiguous, then extrinsic evidence is admissible "to explain and ascertain what the parties intended." *Id*. The court determines whether a contract is ambiguous as a question of law. *Id.* It is "well established" that a contract is ambiguous simply because the parties say it is, nor is it ambiguous just because the parties offer different interpretations. *Id*. Instead, the court must determine whether the contract language is "reasonably susceptible to more than one meaning." *Id.* (internal quotations omitted). Ambiguity may also exist where the language is "obscure in meaning through indefiniteness of expression." *Id.*

While the question of whether the contract is ambiguous is one of law, the determination of the parties' intent by reference to extrinsic evidence is one for the finder of fact. *Id.* If the court finds the terms of the contract ambiguous as a matter of law, summary judgment is only appropriate if the extrinsic evidence bearing on the interpretation is undisputed and a reasonable fact-finder could not find for the non-movant even when all reasonable inferences from the undisputed extrinsic evidence are drawn in its favor. *See Contl. Cas. Co. v. N.W. Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).

**Discussion**

I.      The disputed clause is ambiguous, and a trial is required on that issue.

The central dispute in this cases is the meaning of "Shared Expenses and Assessments" in sentence 6 of the disputed clause. What is it that CPS may offset against base rent and under what circumstances?

In CPS's view, "Shared Expenses" (sentence 4) and "Shared Expenses and Assessments" (sentence 6) refer to MCK's share of what CPS calls "fees and assessments" described in Sections 6.1 through 6.4 of the Operation Agreement. (*See* Def.'s Mem. at 3, 9-10.) CPS claims that sentences 4 through 6 of the disputed clause allow CPS to offset the base rent if what CPS paid on behalf of MCK under Sections 6.1 through 6.4 exceed what CPS collected from the Condo Association in operating expenses.[7] (*See* Def.'s Resp. at 13.) [Dkt 93.] MCK, on the other hand, argues the contract speaks for itself, and cannot mean what CPS claims because it would require the

---

[7] As noted above, it is not clear why CPS defines "fees and assessments" differently from its contractual obligation to pay Facilities Management Expenses and Assessments.

Condo Association to pay both its own and the MCK's Facilities Management Expenses and Assessments. (*See* Pl.'s Mem. at 6; Pl.'s Resp. Def.'s 56.1 Stmt. Add'l Facts.) [Dkt 103, 104.] MCK asserts that "Shared Expenses" are the common area garage operating expenses to be proportionately shared between MCK and CPS pursuant to Article X of the Operation Agreement. (Pl.'s Reply Mem. at 13.)

The court concludes that the terms "Shared Expenses" and "Shared Expenses and Assessments" in the disputed clause are ambiguous as a matter of law. It is clear from the first three sentences, which the parties do not dispute, that CPS agreed to undertake payment of the amounts MCK owed under Sections 6.2, 6.3, 6.4, and 6.12 of the Operation Agreement, as well as responsibility for collecting the amounts in operating expenses the Condo Association owed under Schedule 10.1(b)(2). Thereafter, it gets murky.

To start, the terms are not the same. Sentence 2 refers to the "Facilities Management Expenses and Assessments" that CPS will pay on behalf of MCK, but sentence 4 refers to CPS's payment of "Shared Expenses," a term that is not otherwise defined in the Lease Agreement or the Operation Agreement. To add to the confusion, sentences 5 and 6 refer to CPS's intent to recover its "Shared Expenses and Assessments." CPS wants the contract to be interpreted such that the Shared Expenses and Shared Expenses and Assessments mean its newly defined term "fees and assessments," which itself includes some, but not all of Facilities Management Expenses and Assessments. (Def.'s Resp. at 9-12.) However, "when parties to the same contract use such different language to address parallel issues . . . it is reasonable to infer that they intend this language to mean different things." *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744 (7th Cir. 1996) (applying Illinois law).

13

If "Shared Expenses" and "Shared  Expenses and Assessments" are the same as "Facilities Management Expenses and Assessments," (or even CPS's "fees and assessments") sentence 6 could be reasonably interpreted to require CPS to bill the Condo Association for MCK's Facilities Management Expenses and Assessments (or "fees and assessments") *as well as* the operating expenses referenced in sentence 3, which CPS admits it never did, and to offset the rent in any amount it did not recover from the billing for both items.  But CPS does not read it that way. Under CPS's interpretation, "billing the Condominium Garage Owner" in sentence 6 means billing the Condo Association for its share of the operating expenses.  CPS further contends that sentence 6 provides it with a right to offset rent if the amount it paid for MCK's "fees and assessments" exceeds the amount of operating expenses it collected from the Condo Association.

Because the contract is ambiguous, extrinsic evidence is admissible to determine the parties' intent.  CPS has submitted evidence regarding the parties' negotiation of the Lease Agreement by way of declarations, deposition testimony, e-mails between the parties' representatives, term sheets, and various drafts of the Lease Agreement that preceded the final signed version.  (Def.'s 56.1 Stmt. Add'l Facts ¶¶ 4, 6-28 and attached exhibits.)  Having reviewed the material submitted, the court concludes that a trial is required on this issue. Trying to follow the course of negotiations is particularly complicated by the fact some of the negotiators used various terms, apparently ignoring the value of using terms that were defined in the Operation Agreement.  (*See, e.g.*, Def's Resp. at 4 (describing CPS's use of phrase "Deeded Space Assessment" to mean Condo Association's share of operating expenses, and "common area maintenance charges" to mean MCK's share of "fees and assessments").)  Apparently, CPS included the term "Shared Expenses" in an earlier draft of the Lease Agreement.  (Def.'s Mem. at 5.)  But it is not clear what was said by the parties about that

14

term. CPS has presented enough to create a question requiring a trial.[8]

## II. MCK is entitled to summary judgment on its claims for unpaid amounts after May 31, 2011.

As for the period after May 31, 2011, CPS does not dispute that it failed to pay MCK's portion of the Facilities Management Expenses and Assessments, that it has not yet collected the operating expenses from the Condo Association, and that it did not pay rent for the months of September, October, and November. (Def.'s 56.1 Resp. ¶¶ 19-21, 35, 36.) CPS raises three arguments in defense of its failure to do so.

First, CPS claims that MCK is obligated to affirmatively establish that any amounts owed under the lease should go to MCK and not its foreclosing lender. (Def.'s Mem. at 14.) CPS has offered no authority to support the argument that a pending foreclosure action precludes the lessor from enforcing the lease and obtaining a judgment for unpaid rent. In this case, CPS appears to acknowledge that the foreclosure suit is still ongoing, and MCK asserts it is aggressively defending that suit. (*See* Pl.'s Reply at 3; *id.*, Ex. A.) Even if the rent were subject to a lien, it would not be a defense to CPS's duty to perform under the Lease Agreement. The only question would be to whom CPS should pay, not whether CPS should pay.

Second, CPS claims that, because the Lease Agreement has a clause awarding reasonable attorneys' fees to a prevailing party, summary judgment should be denied because CPS can offset the rent it owes by the amount of its attorneys' fees incurred in this lawsuit if it wins.[9] CPS cannot

---

[8] Of course, this opinion does not determine whether CPS' interpretation is the correct one.

[9] Arguably, a claim for setoff under Illinois law should be pleaded as a counterclaim, not an affirmative defense. 735 Ill. Comp. Stat. § 5/2-608; *Minnesota Elevator, Inc. v. Imperial Elevator Servs., Inc.*, 758 F. Supp. 2d 533, 538 (N.D. Ill. 2010); *Ace Hardware Corp. v. Marn, Inc.*, No. 06 C 5535, 2008 WL 4286975 at *8 (N.D. Ill. Sept. 16, 2008). In any event, the court may treat it as

claim a present right of setoff by an amount that it may or may not become entitled to in the future. A claim for setoff is available only where the debts are "mutual, mature, and of such a certain and ascertainable character as to be capable of being applied in compensation of each other." *Bank of Chicago-Garfield Ridge v. Park Natl. Bank*, 606 N.E.2d 72, 76 (Ill. App. 1st Dist. 1992) (internal quotation omitted). CPS is correct that the Lease Agreement provides that the "prevailing party" in any suit to enforce the contract shall be paid its legal fees and costs. (Lease Agrmt. ¶ 20(j).) However, whether or not CPS will be the "prevailing party" in this suit such that it is entitled to attorneys' fees cannot be determined until judgment has been entered. Therefore, CPS's counterclaim will never be "mature" while this suit is ongoing, and it is not an appropriate basis on which to deny summary judgment for MCK.

Finally, CPS claims that, if its interpretation of the disputed clause is correct, it may have a right of setoff if the operating expenses it collects from the Condo Association for this period are less than the amount it owes on behalf of MCK. (Def.'s Resp. at 14.) Whether or not CPS is correct on the interpretation of the disputed clause, however, it cannot defend its nonpayment of rent on that basis because CPS has not done what it was required to do to claim the alleged right of offset under the Lease Agreement. CPS admits it has never billed the Condo Association for the operating expenses for that period, but asserts that the amounts of operating expenses have not yet been determined. It was *CPS's* obligation under the Lease Agreement to determine those amounts, bill them and collect them. CPS cannot set up its own breach of the Lease Agreement in one respect (failing to determine and bill operating expenses) as a defense to its breach of the Lease Agreement in another respect (failing to pay rent).

---

a counterclaim. *See* Fed. R. Civ. P. 8(c)(2)

Thus, MCK has established that CPS breached the Lease Agreement by failing to pay rent in September-November 2011 in the amount of $245,943, and failing to pay MCK's portion of the Facilities Management Expenses and Assessments for the period of June 1, 2011-November 30, 2011 in the amount of $82,160.[10]

## Conclusion

For the foregoing reasons, MCK's motion for partial summary judgment on Count V of its supplemental complaint is granted in part and denied in part, as follows. The court finds and adjudges that CPS breached its obligations under the Lease Agreement by failing to pay Base Rent for the months of September, October, and November of 2011 ($245,943), failing to pay MCK's portion of Facilities Management Expenses & Assessments set forth in Sections 6.2, 6.3, 6.4, and 6.12 of the Operation Agreement for the period of June 1, 2011 through November 30, 2011 ($82,160.52), and failing to bill and collect operating expenses from the Condo Association set forth in Schedule 10.1(b)(2) of the Operation Agreement for the period of June 1, 2011 through November 30, 2011. Accordingly, CPS is liable to MCK in the amount of $328,103.

---

[10] CPS has presented no evidence to contest the amount that MCK claims as its share of those expenses. (*See* n. 6 above.)

As to MCK's claim of $267,918 for the period prior to June 1, 2011, a question of fact remains as to whether CPS is liable for that amount, and so the motion is denied as to that claim. A bench trial on that issue is set for July 10, 2012, continuing on July 11, 2012 if necessary.


**IT IS SO ORDERED.**

_____
GERALDINE SOAT BROWN
United States Magistrate Judge

DATED: May 29, 2012